IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| William Howard Washington, | ) | C/A No.: 1:14-2415-BHH-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

    A.    Procedural History

On June 27, 2011, Plaintiff filed an application for DIB in which he alleged his disability began on May 25, 2011. Tr. at 230–31. His application was denied initially and upon reconsideration. Tr. at 218–21, 223–24. On February 6, 2013, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") John S. Lamb. Tr. at 120–53 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 8, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 84–98. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–6. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 17, 2014. [ECF No. 1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing. Tr. at 129. He obtained a high school equivalency certificate. Tr. at 128–29. His past relevant work ("PRW") was as an auto parts assembly line worker, a restaurant cook, a detailer, a dishwasher, and a retail stocker. Tr. at 151. He alleges he has been unable to work since May 26, 2011.[1] Tr. at 127.

2.    Medical History

a.    Evidence in Record at Time of Hearing

Plaintiff presented to neurologist Robert A. Ringel, M.D. ("Dr. Ringel"), on June 9, 2010, with a history of generalized muscle weakness, fatigability, positive creatinine phosphokinase ("CPK") and aldolase, a minimally abnormal electromyography ("EMG"), and nonspecific, mild changes on biopsy. Tr. at 437. Cranial nerves, cerebellar,

_____

[1] Although Plaintiff originally alleged his disability began on May 25, 2011, his attorney amended the alleged onset date ("AOD") during the hearing to the day after the prior ALJ's decision. *See* Tr. at 127.

and motor exams revealed 4/5 proximal weakness and easy fatigue. *Id.* Plaintiff demonstrated vibratory sensory loss, minimal hyperreflexia, and slow gait. *Id.* Dr. Ringel diagnosed inflammatory muscle disease and recommended a trial of 60 milligrams of Prednisone and 40 milligrams of Nexium. *Id.*

On June 9, 2010, Plaintiff presented to Ashish G. Shanbhag, M.D. ("Dr. Shanbhag"), with pain in his axial low back and right lower limb. Tr. at 422. Dr. Shanbhag noted that Plaintiff had undergone right L4-5 and L5-S1 transforaminal epidural steroid injections on June 3. *Id.* Plaintiff reported three-and-a-half days of pain relief and increased functioning. *Id.* He indicated his medications were providing some relief, but were not completely relieving his pain. *Id.* Dr. Shanbhag observed Plaintiff to have asymmetric posture with reduced weightbearing in his right lower limb and antalgic gait on the right. *Id.* He prescribed Xolox and Gabapentin for pain and Drisdol for vitamin D deficiency. Tr. at 423.

Plaintiff presented to Joseph Friddle, P.A. ("Mr. Friddle"), at Piedmont Psychiatric Services on June 24, 2010. Tr. at 312. Plaintiff reported improvement in anxiety, nervousness, mood, and energy. *Id.* He complained of pain and being unable to work. *Id.* Mr. Friddle noted that Plaintiff was not using a cane. *Id.* He continued Plaintiff on the same medications. *Id.*

Plaintiff also followed up with Dr. Ringel on June 24, 2010. Tr. at 436. Cranial nerve, cerebellar and motor exams were intact and Plaintiff's gait was normal, but his reflexes were absent. *Id.* Dr. Ringel continued Plaintiff on Prednisone. *Id.*

Plaintiff presented to Austin R. McElhaney, M.D. ("Dr. McElhaney"), complaining of swollen ankles on June 28, 2010. Tr. at 318–22. He stated he had developed two weeks earlier and could hardly walk on his right ankle. Tr. at 318. Plaintiff was 70 inches tall and weighed 335 pounds. Tr. at 319. Dr. McElhaney observed Plaintiff to have a slow, antalgic gait and to be ambulating with a cane. Tr. at 320. He assessed uncontrolled hypertension, asthmatic cough, edema, chronic venous insufficiency/plantar fasciitis, gout, and pityriasis versicolor. *Id.*

On July 5, 2010, Dr. Shanbhag indicated Plaintiff was stable medically and functioning well with medications. Tr. at 421.

Plaintiff followed up with Dr. Ringel on July 7, 2010. Tr. at 435. Dr. Ringel observed Plaintiff to have generalized proximal weakness with gait instability. *Id.* He noted Plaintiff's aldolase and CPK were high and recommended Plaintiff continue taking 60 milligrams of Prednisone. *Id.*

On July 28, 2010, Plaintiff presented to Dr. Shanbhag with low back and leg pain. Tr. at 417. He denied side effects from his medications, but stated their effectiveness had decreased. *Id.* Dr. Shanbhag observed Plaintiff to have asymmetric posture with reduced weightbearing in his right lower limb and an antalgic gait to the right. *Id.* He noted Plaintiff had mild asymmetry of his lumbar spine with a truncal shift to the left and reduced range of motion ("ROM"). Tr. at 417–18. Dr. Shanbhag discontinued Plaintiff's prescription for Xolox and prescribed Roxicodone. Tr. at 418. He continued Plaintiff on Gabapentin for pain and Drisdol for a vitamin D deficiency. *Id.* He recommended

fluoroscopic-guided right L3-4, L4-5, and L5-S1 facet joint medial branch blocks. Tr. at 419.

On August 3, 2010, Dr. Ringel indicated Plaintiff's muscle strength was stabilizing. Tr. at 434. He noted that Plaintiff had been diagnosed with diabetes and that his diabetes was likely exacerbated by use of Prednisone. *Id.* He observed Plaintiff's cranial nerves, cerebellar, and motor exams to be intact, except for mild proximal lower extremity weakness. *Id.* Dr. Ringel decreased Plaintiff's Prednisone dosage. *Id.*

Plaintiff followed up with Dr. McElhaney on August 4, 2010. Tr. at 327–33. He reported bilateral ankle swelling and pain in his shoulders and back. Tr. at 327. He stated he was unable to reach overhead or stand for any extended period. *Id.* He stated he could not be active enough to lose weight and that his increased weight exacerbated his back pain. *Id.* Plaintiff also complained of depression that resulted from his inability support his family. *Id.* Dr. McElhaney observed Plaintiff to demonstrate a slow, antalgic gait with a cane; to have 4/5 grip strength on the right and 5/5 grip strength on the left; to have mild restriction in full cervical lateral rotation and extension bilaterally; to have 1+ swelling, tenderness, stiffness, and decreased ROM in his right lower extremity; and to have trace swelling in his left ankle. Tr. at 329. Plaintiff had decreased reflexes in his lower extremities, knees, and Achilles bilaterally and decreased sensation in his bilateral feet and the fingertips of his right hand. Tr. at 329–30. Dr. McElhaney noted that x-rays were negative for arthritis of the shoulder joints and degenerative arthritis of the right ankle. Tr. at 331.

On August 18, 2010, Plaintiff reported to Dr. Shanbhag that he experienced one day of pain relief from the right lumbosacral facet injection administered on August 5. Tr. at 414. He complained of a new onset of right mid-back anterior chest wall pain. *Id.* Dr. Shanbhag observed Plaintiff to have asymmetric posture with reduced weightbearing in the right lower limb and an antalgic gait to the right. *Id.* Palpation and ROM of Plaintiff's thoracic spine reproduced pain over the T10, T11, and T12 intercostal nerves. Tr. at 415. Dr. Shanbhag refilled Plaintiff's medications and recommended right L4-5 and LS-S1 facet joint neurotomy and right T10, T11, and T12 intercostal nerve injections. Tr. at 415–16.

Plaintiff followed up with Mr. Friddle on August 19, 2010. Tr. at 313. He complained of daily pain, lack of self-worth, low self-esteem, marital conflict, occasional suicidal thoughts, and frustration. *Id.* However, Mr. Friddle noted his affect was less depressed and hopeless, more euthymic, and less frustrated. *Id.* He also observed that Plaintiff did not present with a cane. *Id.* He continued Plaintiff on the same medications, but referred him for cognitive behavioral therapy ("CBT") and possible marriage counseling. *Id.*

On August 24, 2010, Dr. Ringel indicated Plaintiff demonstrated no increased weakness and that his muscle strength was stable and areflexic. Tr. at 433. Dr. Ringel decreased Plaintiff's Prednisone dosage. *Id.*

On August 25, 2010, Plaintiff reported no side effects from his medications and Dr. Shanbhag found Plaintiff to be stable medically and functioning well with medications. Tr. at 412–13.

On September 17, 2010, Plaintiff presented to Dr. McElhaney to request a prescription for Cialis. Tr. at 339. Plaintiff's blood pressure was elevated at 145/94. *Id.* He had lost weight and weighed 315.5 pounds. Tr. at 340. Dr. McElhaney observed Plaintiff to demonstrate a slow, antalgic gait and to ambulate with a cane. Tr. at 341. Plaintiff's grip strength was 4/5 on the right and 5/5 on the left. *Id.* He had mild restriction in cervical rotation and extension bilaterally. *Id.* Plaintiff's lumbar flexion was limited to 30 degrees and he had paralumbar tightness and sacroiliac tenderness. *Id.* His ROM was mildly restricted in his bilateral shoulders. *Id.* He had 1+ swelling, tenderness, stiffness, and decreased ROM in his right lower extremity and trace swelling in his left ankle. *Id.* Dr. McElhaney indicated Plaintiff had no depression, anxiety, or agitation. *Id.*

On September 22, 2010, Plaintiff reported four to five hours of pain relief from the thoracic intercostal nerve injection administered on August 30. Tr. at 409. Plaintiff complained that Roxicodone 15 milligram tablets were only providing 15 minutes of pain relief. *Id.* Dr. Shanbhag observed Plaintiff to have asymmetric posture with reduced weightbearing on the right lower limb and an antalgic gait to the right. Tr. at 410. He adjusted Plaintiff's prescription for Roxicodone from one 15 milligram tablet every eight hours to one 15 milligram tablet every six hours. *Id.* He discontinued Ambien and prescribed Klonopin for sleep. *Id.* He also recommended right lumbar facet joint neurotomy and right T10, 11, and 12 intercostal nerve injection. Tr. at 410–11.

Plaintiff also followed up with Dr. Ringel on September 22, 2010. Tr. at 432. Dr. Ringel observed Plaintiff to have mild weakness in the psoas, hamstrings, and deltoids, but indicated Plaintiff's condition was clinically stable. *Id.*

On October 20, 2010, Plaintiff reported no side effects from medications, and Dr. Shanbhag found that Plaintiff was stable medically and functioning well with medications. Tr. at 407–08.

Plaintiff followed up with Dr. Shanbhag on November 2, 2010, to undergo right thoracic intercostal nerve injections and to discuss his medication regimen. Tr. at 405. He reported mild pain relief with use of Roxicodone 15 milligrams, four times daily. *Id.* He complained of worsening pain and numbness, tingling, and weakness in his back and leg. *Id.* He also reported pain in his neck, arms, and throughout his body with functional activities and activities of daily living. *Id.* Dr. Shanbhag informed Plaintiff that treating pain issues in relation to morbid obesity presented particular difficulty. Tr. at 406. Plaintiff indicated he had pursued options for weight loss and had lost 20 pounds recently. Tr. at 405–06. Dr. Shanbhag referred Plaintiff for EMG and nerve conduction studies ("NCS") of his low back and bilateral lower limbs. Tr. at 406.

Plaintiff followed up with Dr. McElhaney on November 3, 2010, for diabetes and hypertension. Tr. at 343. Dr. McElhaney indicated Plaintiff's blood sugar was well-controlled on Metformin, but that his blood pressure had increased from the prior six-week period. *Id.* Plaintiff complained that his pain was not well-controlled on Roxicodone. *Id.* Dr. McElhaney indicated Plaintiff's affect was less depressed and that he had lost some weight, which was helping him to feel somewhat better overall. Tr. at 345.

On November 9, 2010, Dr. Ringel observed virtually no weakness on cranial nerve, cerebellar, and motor exams. Tr. at 431. Plaintiff had distal vibratory sensory loss and hyperreflexia, but normal gait. *Id.*

8

Plaintiff presented to Husam Mourtada, M.D., on November 10, 2010, for EMG and NCS. Tr. at 308. The studies indicated peripheral neuropathy of Plaintiff's right lower extremity, but no evidence of lumbar radiculopathy. *Id.*

On November 17, 2010, Plaintiff reported no pain relief with the thoracic intercostal nerve injections. Tr. at 402. Dr. Shanbhag discussed with Plaintiff the neurodiagnostic test results, which indicated peripheral neuropathy of the right lower limb. *Id.* Plaintiff complained of full, aching pain in his left buttock and posterior thigh that were aggravated by ambulation and sitting. *Id.* He indicated the pain was relieved by shifting positions and taking medication. *Id.* Dr. Shanbhag observed Plaintiff's posture to be asymmetric with reduced weightbearing in the right lower limb and his gait to be antalgic to the right. Tr. at 403. Plaintiff's ROM was fluid, but restricted. *Id.* Dr. Shanbhag refilled Plaintiff's medications and recommended ultrasound-guided diagnostic left sacroiliac joint injection. Tr. at 403–04.

On December 13, 2010, Plaintiff reported to Dr. Shanbhag that he experienced two days of 80 percent pain relief following the left sacroiliac joint injection on November 30, but that his pain had gradually returned to its baseline. Tr. at 399. He indicated his medications helped his pain significantly, but did not relieve it. *Id.* Plaintiff denied side effects from medications. *Id.* Dr. Shanbhag observed Plaintiff to have asymmetric posture with reduced weightbearing in his left lower limb and antalgic gait to the left. Tr. at 400. He refilled Plaintiff's medications and recommended ultrasounded-guided therapeutic left sacroiliac joint injection, which was administered on December 23. *Id.*, Tr. at 395.

On December 16, 2010, Dr. Ringel observed Plaintiff to have "very mild" proximal muscle weakness in his deltoids, psoas, and supraspinatus. Tr. at 430.

On December 29, 2010, Plaintiff reported to Dr. McElhaney that his blood sugar was running a little higher than normal, but that he had been eating "a little crazy" and had not checked his blood sugar in about a week. Tr. at 350. He also indicated he had not taken his blood pressure medication in two weeks and had not taken Metformin in a week. *Id.* Plaintiff indicated he felt pretty good, but was a little depressed because of his back problems. *Id.* However, he also stated that Roxicodone and steroid injections were not providing good pain control. *Id.* Plaintiff's weight had increased from his prior visit by four-and-a-half pounds to 320 pounds. Tr. at 351. Dr. McElhaney noted the following on musculoskeletal examination: slow, antalgic gait; ambulates with cane; decreased grip right hand; restriction in bilateral cervical mobility; limited lumbar flexion; tightness in lower lumbar paraspinous; and stiffness in bilateral knees. Tr. at 352. On cardiovascular exam, he noted trace venous insufficiency, but no pitting edema. *Id.* On neurological exam, he found Plaintiff to have decreased reflexes. *Id.* He described Plaintiff's affect as "depressed." *Id.*

On January 12, 2011, Plaintiff denied side effects from his medications to Dr. Shanbhag. Tr. at 397. Plaintiff assessed his pain as an eight to 10 of 10 before treatment, an eight of 10 during the visit, an 11 of 10 at worst, and an eight of 10 at best. Tr. at 398. However, Dr. Shanbhag indicated Plaintiff was stable medically and functioning well with medications. *Id.*

Plaintiff followed up with Dr. Ringel on January 18, 2011. Tr. at 429. Dr. Ringel observed mild proximal muscle weakness, but Plaintiff's exam was otherwise normal. *Id.* Dr. Ringel recommended Plaintiff undergo CPK testing and follow up in one month. *Id.*

On January 24, 2011, Plaintiff reported to Mr. Friddle that his mood had worsened as a result of being off his medications. Tr. at 314. Mr. Friddle observed that Plaintiff's affect was less depressed and hopeless, his mood was more euthymic, he was less frustrated, he had clear sensorium, and he ambulated without a cane. *Id.* He refilled Plaintiff's medications, again recommended CBT and possible marriage counseling, and instructed Plaintiff to follow up in three months. *Id.* The next day, Mr. Friddle completed a physician's statement in which he indicated Plaintiff was unable to engage in any type of employment. Tr. at 443.

Plaintiff followed up with Dr. McElhaney on January 27, 2011, and reported difficulty staying asleep at night and tiredness during the day. Tr. at 360. Plaintiff indicated his pain was not relieved through medications or epidural steroid injections. *Id.* He complained of increased pain in his knees. *Id.* Dr. McElhaney noted that carpal tunnel syndrome ("CTS") was affecting Plaintiff's grip and use of his right hand. *Id.* Plaintiff had gained two pounds from his previous visit and weighed 322 pounds. Tr. at 361. Dr. McElhaney observed Plaintiff to have trace venous insufficiency, but no pitting edema. Tr. at 362. On musculoskeletal examination, he noted the following: slow, antalgic gait; ambulates with cane; decreased grip strength in right hand; restriction in bilateral cervical mobility; limited lumbar flexion; tightness in lower lumbar paraspinous; mild right knee stiffness; left knee stiffness; and left ankle swelling and tenderness. *Id.* Plaintiff's reflexes

were decreased and he demonstrated sensory loss in his bilateral feet and in the tips of his right thumb, index, and middle fingers. Tr.at 363. Plaintiff's affect was depressed, but his memory and judgment were intact and he was oriented to time, place, and person. *Id.*

On February 2, 2011, Plaintiff denied relief from left sacroiliac joint injection and indicated his medications were providing only mild relief. Tr. at 395. Dr. Shanbhag observed Plaintiff to have a subtle antalgic gait to the left. Tr. at 396. He increased Plaintiff's prescription for Roxicodone to one to two 15 milligram tablets every eight hours. *Id.*

On February 4, 2011, Dr. McElhaney prescribed a walking cane for Plaintiff's degenerative disc disease and degenerative osteoarthritis and completed a physician's statement. Tr. at 369.

Plaintiff followed up with Dr. Ringel on February 17, 2011, and reported stable symptoms. Tr. at 428. Dr. Ringel observed him to have 4+/5 strength in his deltoids, psoas weakness, minimal gait instability, and mild diminished vibratory sensory loss. *Id.* He altered Plaintiff's Prednisone dosage. *Id.*

On March 2, 2011, Plaintiff indicated to Dr. Shanbhag that his pain medications helped his pain by 75 percent and improved his baseline functioning. Tr. at 393. Dr. Shanbhag described Plaintiff's gait as antalgic to the right and indicated his posture was asymmetric with reduced weightbearing in his right lower limb. *Id.* Dr. Shanbhag continued Plaintiff's pain medication and increased his dosage of Klonopin to improve his sleep. Tr. at 394.

Plaintiff reported no side effects from pain medication during a pain management visit on March 14, 2011. Tr. at 391. He described his pain as an eight to nine of 10 before treatment, an eight of 10 during the visit, a 10 of 10 at worst, and a seven of 10 at best. Tr. at 392. Dr. Shanbhag indicated Plaintiff was stable medically and functioning well with medications. *Id.*

On March 21, 2011, Dr. Ringel observed Plaintiff to have intact cranial nerves, cerebellar, and motor exams; trace to plus reflexes; and slow gait. Tr. at 427. He prescribed bilateral wrist splints and adjusted Plaintiff's Prednisone dosage. *Id.*

Plaintiff followed up with Mr. Friddle on March 24, 2011, and reported his mood to be fairly stable. Tr. at 315. He indicated he experienced good and bad days as a result of chronic pain. *Id.* He complained of poor sleep and anxiety. *Id.* Mr. Friddle observed the following: "Affect is less depressed and hopeless. Mood is more euthymic. Less frustrated. Sensorium clear. No cane[.]" *Id.* He continued Plaintiff's medications and increased Mirtazapine to 30 milligrams, four times per day "to boost depression, and sleep." *Id.*

Plaintiff reported no side effects from his pain medications on April 4, 2011. Tr. at 389. He assessed his pain as a nine of 10 before treatment, an eight of 10 during his visit, a 10 of 10 at worst, and a seven of 10 at best. Tr. at 390. Dr. Shanbhag indicated Plaintiff was stable medically and functioning well with medications. *Id.*

On May 2, 2011, Plaintiff reported to Dr. Shanbhag that he had low back pain and right leg pain. Tr. at 388. He indicated his medications were helping with his pain 50 to 70 percent of the time, depending on his activity level. *Id.* He stated he had lost 15

pounds. *Id.* Dr. Shanbhag described Plaintiff's gait as fluid and non-antalgic. *Id.* He indicated Plaintiff received moderate to significant relief with medications without adverse sequelae and indicated he was otherwise medically stable. *Id.* He instructed Plaintiff to follow up in four months and to continue the same medications. *Id.*

On May 16, 2011, Dr. Ringel observed Plaintiff to have minimal weakness on motor exam, distal sensory loss, minimal hyperreflexia, and normal gait. Tr. at 426. He changed Plaintiff's Prednisone dosage. *Id.*

On May 17, 2011, Plaintiff presented to Dr. McElhaney for routine follow-up and medication refills. Tr. at 372. Dr. McElhaney noted that Plaintiff was having difficulty obtaining his prescriptions and that his compliance with prescribed medications had been poor at times. *Id.* Dr. McElhaney observed Plaintiff to have trace venous insufficiency, but no pitting edema. Tr. at 374. Plaintiff ambulated with a slow, antalgic gait and used a cane. *Id.* He had decreased grip strength in his right hand, restricted bilateral cervical mobility, limited lumbar flexion, and tightness in his lower lumbar area. *Id.* He demonstrated mild stiffness in his right knee. *Id.* In his left lower extremity, he had knee stiffness and ankle swelling and tenderness. *Id.* Plaintiff's reflexes were decreased and he had sensory loss in his feet and right thumb, index, and middle fingers. *Id.* Dr. McElhaney noted Plaintiff's depression to be somewhat improved. *Id.*

On May 25, 2011, Plaintiff reported no side effects from his medications during a visit to Dr. Shanbhag's office. Tr. at 386. He assessed his pain as an eight of 10 before treatment, an eight-and-a-half of 10 during his visit, a 10 of 10 at worst, and an eight of

10 at best. Tr. at 387. Dr. Shanbhag indicated Plaintiff was stable medically and functioning well with medications. *Id.*

Plaintiff followed up with Dr. Ringel on June 27, 2011, and complained of pain in his hands, accompanied by generalized weakness and possible loss of grip strength. Tr. at 425. Dr. Ringel observed Plaintiff to have a normal motor exam and no sensory loss, but to have trace to absent reflexes. *Id.* He recommended lab work, changed Plaintiff's prescription for Prednisone, and referred Plaintiff for EMG. *Id.*

Plaintiff presented to Anthony A. Sanchez, M.D. ("Dr. Sanchez"), on July 18, 2011, complaining of bilateral knee pain, left greater than right. Tr. at 472. Plaintiff reported occasionally swelling, difficulty climbing stairs, use of a cane, and a walking tolerance of 50 feet. *Id.* Dr. Sanchez observed ROM of Plaintiff's knees to be from full extension to 125 degrees of flexion. *Id.* He noted medial tenderness and patellofemoral crepitus, but no lateral tenderness. *Id.* He indicated that May 2009 x-rays suggested near bone-on-bone arthrosis of the medial compartment and mild patellofemoral arthritis. *Id.* Dr. Sanchez diagnosed bilateral knee arthritis, left more symptomatic than right. *Id.* He gave Plaintiff a lateral heel wedge and scheduled him for injections. *Id.* He indicated Plaintiff may be a candidate for total knee arthroplasty, but that he should delay surgery because of his young age. *Id.*

On June 30, 2011, Dr. Ringel indicated that NCS and EMG showed bilateral CTS. Tr. at 424. He recommended left carpal canal injection, which he administered on July 25, 2011. *Id.*, Tr. at 493.

On September 16, 2011, state agency medical consultant Frank Ferrell, M.D., completed a physical residual functional capacity ("RFC") assessment. Tr. at 187–89. He found that Plaintiff was limited as follows: occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climbing ramps/stairs, stooping, kneeling, crouching, and crawling; never climbing ladders/ropes/scaffolds; frequently balancing; and frequently handling and fingering with the bilateral upper extremities. *Id.*

Plaintiff presented to Chris Cutshall, M.D. ("Dr. Cutshall"), to establish care on September 19, 2011. Tr. at 463–68. Plaintiff complained of fatigue, weight gain, insomnia, depression, anxiety, suicidal ideation, and pain in his back, joints, and muscles. Tr. at 465. Dr. Cutshall observed Plaintiff to be ambulating with a cane. Tr. at 466. He found Plaintiff to have normal ROM and strength and no joint enlargement or tenderness in any of his extremities. *Id.* Dr. Cutshall assessed diabetes, hypertension (uncontrolled), major depressive disorder, hypercholesterolemia, and metabolic syndrome. Tr. at 467. He encouraged Plaintiff to increase his activity and to attempt water therapy. *Id.*

On September 27, 2011, Dr. Ringel indicated Plaintiff's gait and mobility were adequate and that his CTS symptomatology was possibly worse on the left than on the right. Tr. at 494. Plaintiff demonstrated some trace weakness and hyperreflexia in his left upper extremity. *Id.* Dr. Ringel recommended a left carpal canal injection, which he performed on October 3, 2011. *Id.*, Tr. at 495.

Plaintiff presented to Susan T. Calhoun, Ph.D. ("Dr. Calhoun"), for a psychological evaluation on October 24, 2011. Tr. at 438–40. Plaintiff indicated that he was seeking disability benefits because of his back problems, but that his back problems caused him to become depressed. Tr. at 438. Plaintiff indicated he watched television and sat on his porch during a typical day. *Id.* He stated that, on a good day, he may walk approximately 70 feet to the corner and back. *Id.* Plaintiff indicated he engaged in personal care and prepared simple meals, but denied performing household chores. *Id.* Plaintiff indicated he drove himself to doctor's appointments, used public transportation, and could handle money. *Id.* Dr. Calhoun observed Plaintiff to be well-groomed, attentive, and cooperative. Tr. at 439. She noted that he was tearful at times during the interview. *Id.* His thought content was intact, but his thought processes appeared slightly slowed and his mood and affect were depressed. *Id.* Plaintiff demonstrated adequate attention, concentration, and memory. *Id.* Dr. Calhoun diagnosed depressive disorder, not otherwise specified ("NOS"), and assessed a Global Assessment of Functioning ("GAF") score of 70.[2] She found that Plaintiff had no more than mild limitations in his ability to complete activities of daily living; moderate limitations in his ability to understand and carry out detailed instructions; and mild-to-moderate limitations in his ability to maintain sufficient concentration and pace to carry out simple instructions and adjust to changes in

---

[2] The GAF scale is used to track clinical progress of individuals with respect to psychological, social, and occupational functioning. American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000. The GAF scale provides 10-point ranges of assessment based on symptom severity and level of functioning. *Id.* If an individual's symptom severity and level of functioning are discordant, the GAF score reflects the worse of the two. *Id.*

a work environment. Tr. at 440. She indicated Plaintiff "would function best in an environment that does not require ongoing interaction with the general public." *Id.*

State agency consultant Leslie Burke, Ph. D., completed a psychiatric review technique ("PRT") on October 27, 2011, and considered Listing 12.04 for affective disorders. Tr. at 186. She found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. *Id.*

Plaintiff presented to James Essman, M.D. ("Dr. Essman") for numbness and pain in his bilateral hands on November 9, 2011. Tr. at 553. Dr. Essman observed Plaintiff to have full ROM of both hands. Tr. at 554. He had positive Tinel's sign, but no thenar atrophy. *Id.* Plaintiff demonstrated localized tenderness in the carpal tunnel area. *Id.* Dr. Essman administered a cortisone injection to Plaintiff's right carpal tunnel, instructed him to wear his splints, and indicated that carpal tunnel release may be required if conservative measures failed to improve his symptoms. *Id.*

On November 11, 2011, Plaintiff reported to Dr. Sanchez that he experienced intermittent knee swelling and sometimes used a cane to ambulate. Tr. at 473. Dr. Sanchez observed no significant swelling, but found Plaintiff to be tender to palpation along the medial joint line and to have moderate patellofemoral crepitus. *Id.* Plaintiff received the first of five Supartz injections to his bilateral knees. *Id.* At a follow up on November 17, Plaintiff reported minimal improvement in his knee pain and Dr. Sanchez noted no changes on physical examination. Tr. at 474. Dr. Sanchez administered second injections to Plaintiff's bilateral knees. *Id.* Plaintiff reported to Dr. Sanchez for his third

Supartz injections on November 22 and indicated no improvement. Tr. at 475. Dr. Sanchez noted the same findings on objective examination that were observed prior to the first Supartz injections. *Id.*

Plaintiff presented to Dr. Cutshall regarding elevated blood pressure on November 23, 2011. Tr. at 526. Dr. Cutshall noted that Plaintiff had lost weight and was down to 307 pounds from 327 pounds at his prior visit. *Id.* He noted no abnormalities aside from elevated blood pressure over the prior two-week period. Tr. at 527–28.

On November 30, 2011, Plaintiff reported to Dr. Essman that the right carpal tunnel injection helped for a few days, but that he was still having pain and numbness in his bilateral hands. Tr. at 555. Because Plaintiff was uncertain about proceeding with surgery, Dr. Essman instructed him to continue to wear his splints at night and to follow up in a month. *Id.*

Plaintiff reported some relief to Dr. Sanchez on December 2, 2011. Tr. at 476. However, Dr. Sanchez noted no changes on physical examination. *Id.* He administered the fourth injections. *Id.* Plaintiff again informed Dr. Sanchez of improved symptoms on December 8, 2011, and Dr. Sanchez administered the fifth Supartz injections. Tr. at 477.

State agency consultant Debra C. Price completed a PRT on December 8, 2011. Tr. at 201–02. She considered Listing 12.04 and found that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, or pace. Tr. at 201.

State agency medical consultant Matthew Fox, M.D., completed a physical RFC on December 8, 2011, and found Plaintiff to be limited as follows: occasionally lift

and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; frequently balance; never climb ladders/ropes/scaffolds; and frequently handle and finger with the bilateral upper extremities. Tr. at 203–05.

On December 12, 2011, cranial nerves, cerebellar, and motor exams revealed Plaintiff to have bilateral abductor pollicis brevis ("APB") weakness, but normal proximal motor strength. Tr. at 496. Plaintiff's reflexes could not be elicited, but his gait was normal. *Id.* Dr. Ringel decreased Plaintiff's Prednisone dose and instructed him to follow up in a month. *Id.*

Plaintiff followed up with Dr. Cutshall for hypertension on January 4, 2012. Tr. at 531. Dr. Cutshall noted Plaintiff had "good weight loss" and Plaintiff's weight was decreased by another two pounds. *Id.* He observed no abnormalities on examination and adjusted Plaintiff's blood pressure medications. Tr. at 532–33.

Plaintiff followed up with Dr. Sanchez on January 11, 2012, and indicated no relief from Supartz or Cortisone injections. Tr. at 478. He complained of pain in his bilateral knees, left groin, and low back, with radiation down his posterior leg. *Id.* On physical exam, Plaintiff's knee ROM was from full extension to 125 degrees of flexion without instability. Tr. at 479. Plaintiff had medial tenderness on the left that increased with McMurray's testing. *Id.* Dr. Sanchez referred Plaintiff for an x-ray, which revealed mild narrowing of the medial compartments bilaterally with preservation of cartilage space. *Id.* Dr. Sanchez prescribed Mobic and Flexeril and referred Plaintiff for an MRI to

rule out a meniscal tear. *Id.* The MRI indicated a horizontal cleavage tear of the medial meniscus, as well as some arthritic changes. Tr. at 482.

Dr. Ringel completed a physician's statement on January 12, 2012, and indicated Plaintiff was unable to work. Tr. at 469.

On January 23, 2012, Dr. Essman noted that Plaintiff had received multiple carpal tunnel injections, but that they had only provided short-term relief. Tr. at 556. Plaintiff indicated he needed to address other medical issues before proceeding with carpal tunnel surgery. *Id.*

Plaintiff followed up with Mr. Friddle on January 24, 2012. Tr. at 550. He reported chronic pain, depressed mood, sadness, hopelessness, anhedonia, and frustration. *Id.* Dr. Friddle noted Plaintiff to be ambulating without a cane. *Id.* He prescribed Mirtazapine 30 milligrams, to be taken once daily, and Venlafaxine 50 milligrams, to be taken twice daily, and continued Plaintiff's prescription for Klonopin. *Id.*

On February 2, 2012, Jeff Smith, M.D. ("Dr. Smith"),[3] and Mr. Friddle completed a medical source statement in which they identified particular limitations Plaintiff would encounter in the workplace. Tr. at 470.

Plaintiff followed up with Dr. Sanchez on February 8, 2012, and indicated he desired to proceed with surgery. Tr. at 480. Dr. Sanchez diagnosed a left knee meniscal tear. Tr. at 481. He prescribed Ultracet and indicated Plaintiff would be scheduled for arthroscopic surgery. Tr. at 482. On March 22, 2012, Dr. Sanchez performed left knee

---

[3] The treatment notes from Piedmont Psychiatric Services indicate Dr. Smith to be Mr. Friddle's supervising physician. *See* Tr. at 312–15, 442, 550–51.

arthroscopic partial medial and lateral meniscectomies with tricompartmental chondroplasty shaving. Tr. at 483–84.

Plaintiff presented to orthopedist Tony DiNicola, M.D. ("Dr. DiNicola") for an initial visit on March 13, 2012. Tr. at 504. Plaintiff indicated most of his low back pain was concentrated over the lumbosacral junction and described it as constant, sharp, and shooting. *Id.* He indicated his pain ranged from an eight of 10 to a 10 of 10. *Id.* Dr. DiNicola observed Plaintiff to be tender to palpation at the lumbosacral junction and to have pain with lumbar flexion and extension, but to demonstrate normal strength, sensation, and reflexes. Tr. at 505. Plaintiff's sustained hip flexion, pelvic rock, and lumbar facet joint maneuvers were positive, but Faber's test was negative. *Id.* Dr. DiNicola assessed lumbar degenerative disc disease and lumbar radiculopathy. *Id.* He referred Plaintiff for a new MRI of his lumbar spine. Tr. at 506.

Plaintiff followed up with Dr. Sanchez on April 5, 2012, and was ambulating with crutches. Tr. at 488. ROM of Plaintiff's knee was from full extension to 120 degrees of flexion. Tr. at 489. Dr. Sanchez removed Plaintiff's sutures, instructed him to transition off of crutches, and prescribed Lortab for pain. *Id.*

Plaintiff followed up with Dr. DiNicola on April 6, 2012. Tr. at 507. Dr. DiNicola indicated Plaintiff's insurance company denied coverage for a new MRI. *Id.* He referred Plaintiff for two to three physical therapy visits and again requested he be sent for an MRI. Tr. at 508.

On May 7, 2012, Plaintiff reported to Dr. Sanchez that he was doing well overall. Tr. at 490. He indicated he experienced occasional aches, had difficulty climbing stairs,

and could ambulate 60 to 70 feet at a time. *Id.* Dr. Sanchez refilled Plaintiff's prescription for Lortab and instructed him to increase his activity as tolerated. Tr. at 491.

On May 10, 2012, Dr. DiNicola indicated Plaintiff complained of increased pain following physical therapy visits. Tr. at 510. He wrote that Plaintiff's insurer continued to deny coverage for an MRI. *Id.* Dr. DiNicola observed Plaintiff to have a positive straight-leg raise and positive lumbar facet joint maneuvers bilaterally. Tr. at 511. He refilled Plaintiff's prescription for Lortab and again requested he be sent for an MRI. *Id.*

An MRI of Plaintiff's lumbar spine on June 4, 2012, indicated mild degenerative disc changes at L4-5, with bilateral degenerative facet arthrosis and resulting mild bilateral neural foraminal narrowing. Tr. at 560–61.

Plaintiff received a right L5 selective nerve root block on June 20, 2012. Tr. at 513.

On July 18, 2012, Dr. Ringel observed Plaintiff to have no increased tone, minimal generalized weakness, to be areflexic, and to have normal gait. Tr. at 497. Plaintiff's blood pressure was significantly elevated at 190/112. *Id.* Dr. Ringel continued Plaintiff's Prednisone dosage and referred him to his primary care physician for treatment of hypertension. *Id.*

Plaintiff followed up with Dr. Cutshall on August 27, 2012, and reported increased stress. Tr. at 536. Dr. Cutshall indicated Plaintiff experienced knee and back pain, but was "doing well." *Id.* Plaintiff indicated he was a "stress eater" and his weight had increased by 10 pounds since his last visit. *Id.* Plaintiff complained of fatigue, weight

gain, back pain, and joint swelling. Tr. at 537. Dr. Cutshall indicated no abnormalities on examination. Tr. at 538–39.

Plaintiff complained to Dr. DiNicola of increased lower extremity pain on August 29, 2012. Tr. at 514. Dr. DiNicola scheduled Plaintiff for bilateral L4-5 transforaminal epidural steroid injections and refilled his prescription for Percocet 10/325, three times daily. Tr. at 515. He also increased Plaintiff's prescription for Gabapentin to 600 milligrams three times daily. Tr. at 516.

On August 31, 2012, Plaintiff complained to Dr. Ringel that his bilateral CTS symptomatology was worsening. Tr. at 498. Cranial nerves, cerebellar, and motor exams revealed increased tone, postural instability, and mild tremor at rest. *Id.* Dr. Ringel recommended a repeat EMG to determine whether surgery was needed. *Id.* NCS and EMG on September 13, 2012, indicated mild bilateral CTS. Tr. at 499. Dr. Ringel indicated that, although the tests revealed only mild CTS, it had been "significantly disruptive" to Plaintiff. Tr. at 500. He recommended Plaintiff consult with Dr. Essman regarding possible surgical intervention. *Id.*

On September 26, 2012, Plaintiff reported to Dr. DiNicola that he was unable to obtain the bilateral L4-5 transforaminal epidural steroid injections because of financial hardship. Tr. at 517. Plaintiff indicated Percocet and Gabapentin were relieving his pain without side effects. *Id.* Dr. DiNicola observed Plaintiff to have an antalgic gait and to be using a cane. Tr. at 518.

Plaintiff complained of generalized weakness, fatigue, muscle cramps, and paresthesias in his bilateral hands to Dr. Ringel on November 15, 2012. Tr. at 501.

24

Cranial nerves, cerebellar, and motor exams showed generalized proximal 4/5 weakness, 4/5 APB weakness, distal pinprick sensory loss in the feet, light touch sensory loss in the distal median nerve distribution of the hands, and general areflexia. *Id.* Dr. Ringel recommended a reduced dose of Prednisone. *Id.*

On November 21, 2012, Plaintiff reported no improvement since starting an increased dosage of the Fentanyl patch. Tr. at 520. Dr. DiNicola discontinued the Fentanyl patch and Percocet and replaced them with Oxycodone 15 milligrams, every six hours as needed for pain. Tr. at 522. He also increased Plaintiff's prescription for Gabapentin to 800 milligrams, three times daily. *Id.*

On December 18, 2012, Plaintiff complained to Dr. Ringel that he was experiencing more pain from CTS. Tr. at 502. Dr. Ringel observed Plaintiff to have gait instability and pain in the joints of his right hand. *Id.* He referred Plaintiff back to Dr. Essman for possible surgery. *Id.*

Dr. Cutshall completed an application for Plaintiff to receive a disabled placard on December 20, 2012. Tr. at 503.

Plaintiff followed up with Dr. DiNicola on December 21, 2012, and reported that Oxycontin 15 milligrams was not providing pain relief for the full six hours between doses. Tr. at 523. Dr. DiNicola prescribed long-acting Oxycontin 20 milligrams, to be taken every 12 hours, and continued Plaintiff's prescriptions for Oxycontin 15 milligrams, to be taken every six hours, and Gabpentin 800 milligrams, to be taken three times daily. Tr. at 525.

Plaintiff followed up with Mr. Friddle on January 14, 2013, and reported that he was out of medication. Tr. at 551. Mr. Friddle indicated Plaintiff had not been seen in 10 months.[4] *Id.* Plaintiff indicated his mood had improved and that he was experiencing less sadness and hopelessness and was sleeping better. *Id.* He continued to endorse low self-esteem and self-worth because of his work and financial situations. *Id.* Mr. Friddle indicated Plaintiff's affect was a bit down and his mood was anhendonic and frustrated. *Id.* Plaintiff had good memory, concentration, focus, judgment, and insight. *Id.* Mr. Friddle refilled Plaintiff's medications. *Id.* He and Dr. Smith again completed a medical source statement in which they indicated the same restrictions as on February 2, 2012. *Compare* Tr. at 552, *with* Tr. at 470.

Plaintiff followed up with Dr. Essman for carpal tunnel release on January 23, 2013. Tr. at 558.

On January 29, 2013, Dr. Ringel completed another medical source statement, which was similar to the one he completed on January 12, 2012. *Compare* Tr. at 559, *with* Tr. at 469. He indicated Plaintiff was unable to engage in any type of employment and had diagnoses of polymyositis and CTS. *Id.* He wrote "Cannot lift, climb, bend. Uses pain meds." *Id.* He then specified that Plaintiff should not lift or carry greater than five pounds. *Id.*

---

[4] The last treatment note prior to this visit was dated January 24, 2012. *See* Tr. at 550. Unless an intervening treatment note was omitted from the record, it seems that Plaintiff had not actually seen Mr. Friddle in nearly 12 months.

26

b.    Evidence Admitted by Appeals Council

On March 29, 2013, Dr. Smith and Mr. Friddle provided a medical source statement regarding Plaintiff's mental ability to do work-related activities. Tr. at 563–65. They indicated Plaintiff had marked restriction in his abilities to understand and remember complex instructions, carry out complex instructions, make judgments on complex work-related decisions, interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond appropriately to usual work situations and to change in a routine work setting. Tr. at 563–64. They indicated Plaintiff was moderately limited in his abilities to carry out simple instructions and make judgments on simple work-related decisions. Tr. at 563. Dr. Smith and Mr. Friddle provided the following specific observations:

> Unable to move around efficiently. In constant, chronic pain. His level of pain worsens his ability to concentrate on the task at hand and carry out tasks due to his immobility. Chronic pain causes him to feel depressed and worthless which also interferes with his concentration and emotional stability.

*Id.* They further specified Plaintiff was "[e]asily irritable and agitated and at times emotionally unstable which may affect his ability to interact/communicate with peers/public appropriately." Tr. at 564. They indicated Plaintiff was "[u]nable to be punctual or reliable due to multiple issues being treated by several doctors," and stated "I feel he is physically incapable which causes secondary depressive symptoms & flares in mood." *Id.* Dr. Smith and Mr. Friddle provided that their assessment was supported by Plaintiff's emotional lability, depressed mood, tearfulness at times, constant pain and grimacing during visits, slow walk with cane, and difficulty getting up from and down

27

into a chair. *Id.* They indicated Plaintiff's limitations were first present on April 6, 2010. *Id.*

### c.     Evidence Rejected by Appeals Council

Plaintiff followed up with Dr. DiNicola on January 15, 2013, and reported low back and lower extremity pain. Tr. at 48. Plaintiff indicated only minimal improvement since adding Oxycontin to his medication regimen and denied problems or side effects from his medications. *Id.* Dr. DiNicola authorized Plaintiff to receive a temporary handicapped placard for his car. *Id.*, Tr. at 50.

Plaintiff underwent left carpal tunnel release on January 23, 2013. Tr. at 17. He followed up with Dr. Essman on January 30, and Dr. Essman observed the wounds to be healing well. Tr. at 18. On February 5, Dr. Essman removed Plaintiff's sutures and provided him with instructions on scar massage and ROM exercises. Tr. at 19. Plaintiff presented to Dr. Essman for a four-week follow up on February 19, and reported some scar tenderness. Tr. at 20. Dr. Essman instructed Plaintiff to discontinue use of the wrist splint and to continue with scar massage and ROM exercises. *Id.* At a 10-week follow up on April 3, 2013, Plaintiff reported occasional discomfort. Tr. at 21. Dr. Essman observed Plaintiff to have "a little scar tenderness," but full ROM. *Id.*

Plaintiff complained of low back and lower extremity pain to Dr. DiNicola on February 12, 2013. Tr. at 51. He reported little improvement since titrating his Oxycontin dose and indicated his pain medications provided only mild relief. *Id.* Dr. DiNicola increased Plaintiff's Oxycontin dose from 40 milligrams to 60 milligrams every 12 hours and refilled his other medications. Tr. at 53.

Plaintiff returned to Dr. Sanchez on February 18, 2013, and reported continued swelling, popping, and grinding in his knees. Tr. at 62. He indicated his right knee was giving him trouble, but stated both knees occasionally gave way and hyperextended. *Id.* Dr. Sanchez indicated Plaintiff used a cane and brace, but could only walk 60 to 70 feet and had difficulty with stairs. *Id.* Dr. Sanchez indicated the ROM of Plaintiff's knees to be from full extension to 110 degrees of flexion without instability or effusion. Tr. at 64. He also indicated both of Plaintiff's knees hyperextended to five degrees and demonstrated crepitus. *Id.*

An MRI of Plaintiff's bilateral knees on March 1, 2013, indicated the following in Plaintiff's right knee: a focal grade four chondral defect involving the nonweightbearing surface of the lateral tibial plateau; mild irregularity of the cartilage involving the nonweightbearing surface of the medial femoral condyle; generalized thinning of the patellofemoral cartilage; and a small joint effusion. Tr. at 66. The MRI indicated no recurrent meniscal tear on the left and stable lateral tibial plateau, lateral femoral condyle, and chondromalacia patella, but thinning and irregularity of the cartilage overlying the medial compartment with subchondral cystic changes and a small joint effusion. Tr. at 67.

Plaintiff followed up with Dr. Ringel on March 12, 2013. Tr. at 44. He reported minimal weakness and left CTS symptomatology, but no muscle pain. *Id.* Dr. Ringel recommended that Plaintiff continue to use a splint on his left hand. *Id.*

Plaintiff also followed up with Dr. DiNicola on March 12, 2013, for pain in his low back pain and lower extremity. Tr. at 54. He reported improvement without side effects on the increased dose of Oxycontin. *Id.*

Plaintiff presented to Mr. Friddle on March 28, 2013. Tr. at 28. He reported more sadness and hopelessness and requested that paperwork be completed for his disability claim. Tr. at 28. Mr. Friddle observed that Plaintiff's affect was "a bit down," that his mood was anhedonic and frustrated, and that he was anxious about his pending disability case. *Id.* However, he also noted Plaintiff was appropriately oriented, had intact memory, demonstrated normal concentration and focus, showed average judgment and insight, had logical thought processes, and was appropriately dressed and groomed. *Id.* Mr. Friddle increased Plaintiff's prescription for Venlafaxine. *Id.*

On April 2, 2013, Plaintiff presented to Dr. Cutshall with an acute cough and congestion. Tr. at 30. During the visit, Plaintiff discussed his disability claim with Dr. Cutshall. *Id.* Dr. Cutshall indicated the following:

> Long discussion w/ patient regarding disability benefits. He is frustrated that he got turned down recently again. He feels that he cannot work and I don't necessarily disagree. I do not know enough about his physical capabilities to fill out a functional assessment and would be glad to refer him to occupational medicine. He has had multiple back surgeries. He has HTN, DM2 both of which are well controlled. His biggest hurdles to working seem to be primarily functional from back pain, morbid obesity, and major depression. He does not have a lot of self worth and feels guilty that his wife has to work so hard to support them. He has not worked in over 5 years.

*Id.*

30

In April 2013, Dr. Ringel completed a medical source statement regarding Plaintiff's ability to perform physical activities. Tr. at 34–36. He indicated Plaintiff was limited as follows: occasionally lift up to 10 pounds; never lift over 10 pounds; sit for one hour in an eight-hour workday; stand/walk for one hour in an eight-hour workday; ambulate 50 feet without the use of a cane; occasionally reach, handle, finger, feel, and push/pull with his bilateral upper extremities; occasionally climb stairs/ramps; and never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl. Tr. at 34–36. He indicated use of a cane was medically necessary. Tr. at 35. He anticipated Plaintiff would be absent from work more than three times per month because of his impairments or treatment. Tr. at 36. He opined that Plaintiff's pain or other symptoms were frequently severe enough to interfere with attention and concentration needed to perform even simple work tasks. *Id.* Finally, Dr. Ringel indicated the limitations had lasted or were expected to last for 12 consecutive months. *Id.*

Plaintiff reported continued pain in his bilateral knees to Dr. Sanchez on April 8, 2013. Tr. at 69. Dr. Sanchez instructed Plaintiff to continue using his brace and cane and to follow up in six to eight weeks. Tr. at 71. He noted that Plaintiff's arthritis was not severe enough to warrant knee replacement. *Id.*

On April 18, 2013, Plaintiff followed up with Dr. DiNicola regarding low back and lower extremity pain. Tr. at 58. Plaintiff requested an increase in his medications. *Id.* Plaintiff declined a referral to physical therapy and Dr. DiNicola encouraged him to initiate a home exercise program. Tr. at 60.

Plaintiff presented to Jason Johnson, D.O. ("Dr. Johnson"), on May 10, 2013. Tr. at 37. He indicated that his right inguinal hernia had worsened and bothered him occasionally at night and when he engaged in physical activity. *Id.* Plaintiff elected to proceed with laparoscopic inguinal hernia repair. Tr. at 40. However, he had an abnormal EKG and Dr. Johnson required he obtain cardiac clearance from his primary care physician before proceeding with hernia repair surgery. *Id.*

On June 5, 2013, Plaintiff presented to Dr. Nicola with low back pain. Tr. at 8. He complained of pain primarily at the lumbosacral junction, but also reported pain over the bilateral lumbar facet joint lines. Tr. at 10. He complained of increased pain with lumbar flexion and extension. *Id.* Plaintiff had normal strength, trace and symmetric deep tendon reflexes, intact sensation, and a negative straight leg raise. *Id.* Dr. DiNicola refilled Plaintiff's prescriptions for Oxycontin and Oxycodone and prescribed Tramadol. Tr. at 10–11.

Plaintiff followed up with Dr. DiNicola on July 31, 2013, and reported pain in his low back and right shoulder. Tr. at 12. He indicated he lost his last prescription and was out of Oxycodone and Oxycontin. *Id.* He reported increased right shoulder pain with overhead activities and driving, but denied paresthesias or weakness in the right upper extremity. *Id.* Dr. DiNicola described Plaintiff's gait as antalgic and noted that he was using a cane. Tr. at 14.

On July 29, 2013, Plaintiff reported to Mr. Friddle that his mood was worse and that he felt more sad and hopeless. Tr. at 7. Plaintiff complained that he continued to struggle with chronic pain. *Id.* Mr. Friddle indicated Plaintiff's affect was down, his

mood was anhedonic and frustrated, and he was anxious. *Id.* However, he also noted Plaintiff had intact memory, was appropriately oriented, had normal focus and concentration, had average judgment and insight, had logical thought processes, and was appropriately dressed and groomed. *Id.* He continued Plaintiff's prescriptions for Venlafaxine and Mirtazepine. *Id.*

On September 25, 2013, Plaintiff reported to Dr. Sanchez that he was experiencing intermittent swelling, popping, and pain in his bilateral knees that was worse on the right than on the left. Tr. at 22. Plaintiff reported using a cane and a brace and having a walking tolerance of 50 feet. *Id.* Dr. Sanchez observed Plaintiff to have full extension to 110 degrees of flexion without instability. *Id.* He noted medial joint line tenderness that increased with McMurray's testing bilaterally. *Id.* Dr. Sanchez's impression was bilateral knee arthritis, but he indicated a degenerative meniscus tear of the right knee needed to be ruled out through MRI. Tr. at 24. Dr. Sanchez indicated the following: "Mr. Washington's symptoms are progressively worsening and [he] does have mechanical symptoms. . . . He may ultimately benefit from total knee arthroplasty, however, his arthritis does not look severe enough to warrant that at present. He should continue pain management." *Id.* An MRI of Plaintiff's right knee revealed irregular cartilage within all three compartments and a small joint effusion, but no meniscal or ligamentous tear. Tr. at 26–27.

C.    The Administrative Proceedings

1.    The Administrative Hearing

a.    Plaintiff's Testimony

At the hearing on February 6, 2013, Plaintiff testified he had not worked or received unemployment or Workers' Compensation benefits since his AOD. Tr. at 130. He indicated his back pain to be his most severe impairment. Tr. at 131. He stated he had multiple injections in his back that provided no relief. Tr. at 132. He indicated he was 5'10" tall and weighed 325 pounds. *Id.* He indicated he had gained approximately 100 pounds since he stopped working. Tr. at 142. He stated he had surgery on his left knee in April 2012 and was planning to have right knee surgery. Tr. at 133–34. Plaintiff stated he was diagnosed with CTS and had recent surgery on his left hand. Tr. at 135–36. He indicated surgery for his right hand would be scheduled at his follow up visit later in the month. Tr. at 137. Plaintiff endorsed symptoms that included swelling, pain, numbness, and tingling in his hands. *Id.* He testified he had problems with high blood pressure that caused severe headaches. Tr. at 137–38. He indicated he had diabetes and was insulin-dependent. Tr. at 139–40. He stated he experienced blurred vision, tingling in his hands and feet, and frequent urination occurring between 20 and 25 times per day. Tr. at 141. Plaintiff testified that he experienced depression, but had never been hospitalized. Tr. at 142–43. He indicated he sometimes had crying spells that would interfere with his ability to work. Tr. at 143. He stated he did not handle stress well. *Id.* Plaintiff indicated he also experienced pain in his neck. Tr. at 144.

34

Plaintiff testified he experienced daily pain. Tr. at 146. He indicated he had participated in physical therapy and received electric stimulation therapy in the past. *Id.* He estimated that he received three injections in his bilateral hands, six or seven injections in his knees, and nine injections in his back. *Id.* Plaintiff testified he ambulated with a cane that was prescribed by Dr. McElhaney two years earlier. Tr. at 146–47. He stated he used braces on his hands that were prescribed by Dr. Ringel. Tr. at 147.

Plaintiff testified that bending, stooping, squatting, twisting, and turning exacerbated his pain. *Id.* He stated he had difficulty sleeping and slept for only three to four hours per night. Tr. at 147–48. He indicated he awakened eight or nine times to go to the bathroom and had difficulty falling and staying asleep because of depression, emotional problems, pain, and stress. Tr. at 148. Plaintiff stated he had crying spells several times per week and had thoughts of self-harm once or twice a month. Tr. at 147–48. He indicated that several times per month he had panic attacks that were accompanied by chest pain, shortness of breath, hot flashes, sweating, and lethargy. Tr. at 148.

Plaintiff testified he could walk 40 to 50 feet and lift five to 10 pounds. Tr. at 135. He indicated he could sit for 15 to 20 minutes at a time. *Id.* He endorsed side effects from his medications that included lethargy and tiredness and indicated they required him to lie down. *Id.*

Plaintiff testified he lived with his wife and son. Tr. at 145. He indicated he had a driver's license, but did not drive frequently. *Id.* He denied performing household chores, yard work, or shopping. Tr. at 145, 149. He stated he had no hobbies and participated in no social activities. Tr. at 149–50. He testified that he spent most days watching

television and lying down and that he did not get up and dress every day. *Id.* He indicated

he no longer attended church. Tr. at 150.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Benson Hecker reviewed the record and testified at the

hearing. Tr. at 150–53. The VE categorized Plaintiff's PRW as an assembly line worker

of auto parts, which requires medium exertion and has a specific vocational preparation

("SVP") of three; a restaurant cook, which is medium in exertional level with an SVP of

five; a detailer, which is medium work with an SVP of three; a dishwasher, which is

medium work with an SVP of two; and a retail stocker, which is heavy in exertion with

an SVP of four. Tr. at 151. The VE indicated Plaintiff had no transferable skills to the

light exertional level. *Id.* The ALJ described a hypothetical individual of Plaintiff's

vocational profile who could perform sedentary work; could never climb ladders, ropes,

or scaffolds; could only occasionally perform all other postural activities; must avoid

concentrated exposure to hazards, fumes, dusts, gases, and poor ventilation; and was

restricted to simple, routine, repetitive tasks with no ongoing public contact and low

stress, "defined as only occasional in work setting or decision-making. Tr. at 151–52. The

VE testified that the hypothetical individual would be unable to perform any of Plaintiff's

PRW. Tr. at 152. The ALJ asked whether there were any other jobs in the regional or

national economy that the hypothetical person could perform. *Id.* The VE identified

unskilled, sedentary work as a sorter, with 410,000 positions in the national economy and

8,200 positions in South Carolina; an assembler, with 229,000 positions in the national

economy and 2,700 positions in South Carolina; and a surveillance monitor, with 79,000

36

positions nationally and 790 positions in South Carolina. *Id.* The ALJ asked the VE to assume that the hypothetical individual would miss three or more workdays per month. *Id.* He asked if such an individual could engage in work activity. *Id.* The VE indicated that he could not. *Id.*

Plaintiff's attorney asked the VE to assume a hypothetical individual of Plaintiff's vocational profile who had the limitations provided in the first hypothetical, but to further assume the individual would be unable to meet the minimum standards of employment, such as productivity, punctuality, and reliability; would be unable to exhibit concentration, persistence, and pace required of a typical job setting; and would be unable to work a normal workday without the necessity of frequent breaks and rest periods. Tr. at 153. Plaintiff's attorney asked if the individual could perform any work at the sedentary exertional level. *Id.* The VE testified that he could not. *Id.* Plaintiff's attorney asked if any of the factors set forth in the hypothetical would singly limit the individual's ability to work. *Id.* The VE responded that the combination of factors would preclude work. *Id.*

2.     The ALJ's Findings

In his decision dated March 8, 2013, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant last met the insured status requirements of the Social Security Act on June 30, 2012.
2.     The claimant did not engage in substantial gainful activity during the period from his alleged onset date of May 26, 2011 through his date last insured of June 30, 2012 (20 CFR 404.1571 *et seq.*).
3.     Through the date last insured, the claimant had the following severe impairments: carpal tunnel syndrome (CTS), hypertension, diabetes

37

mellitus, obesity, depression, degenerative disc disease (DDD), disorders of the lower back, and bilateral knee disorders (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except no climbing ladders, ropes and scaffolds; occasionally performing all other postural activities; and avoidance of concentrated exposure to hazards, fumes, odors, dust, gases, and poor ventilation; and limited to simple, routine and repetitive tasks with no ongoing public contact and low stress defined as only occasional change in the work setting or decision-making.

6.    Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.    The claimant was born on October 24, 1963 and was 48 years old, which is defined as a younger individual age 45–49, on the date last insured (20 CFR 404.1563).

8.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.    Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11.   The claimant has not been under a disability, as defined in the Social Security Act, from May 26, 2011, the alleged onset date, through June 30, 2012, the date last insured (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 89–98.

D.    Appeals Council Review

The Appeals Council admitted two briefs from Plaintiff's attorney and an evaluation from Mr. Friddle and Dr. Smith, dated March 29, 2013. Tr. at 5. On April 18,

2014, the Appeals Council issued a notice denying Plaintiff's request for review. Tr. at 1–6. The Appeals Council indicated it considered the reasons Plaintiff disagreed with the ALJ's decision and the additional evidence that it admitted, but "found that this information does not provide a basis for changing the Administrative Law Judge's decision." Tr. at 1–2. The Appeals Council indicated it looked at all the records Plaintiff submitted, but found that the following records pertained to a time period after his date last insured ("DLI"): Orthopaedic Associates, dated January 15, 2013–April 18, 2013 (15 pages) and June 5, 2013–July 31, 2013 (9 pages); Neurology Centers of the Carolinas, dated March 12, 2013 (2 pages) and April 11, 2013 (4 pages); Carolina Medical Affiliates, dated April 5, 2013 (5 pages); Orthopedic Specialties of Spartanburg, dated February 18, 2013–April 8, 2013 (11 pages) and September 25, 2013–October 18, 2013 (7 pages); Piedmont Psychiatric Services, dated March 28, 2013 (3 pages), March 29, 2013 (4 pages), and July 28, 2013 (2 pages); Regional Surgical Weight Loss, dated May 10, 2013 (6 pages); R. Ringel, M.D., dated April 1, 2013 (5 pages); Joseph Friddle, P.A., dated March 26, 2013 (3 pages); and Carolina Hand Center, dated January 21, 2013–April 3, 2013 (7 pages). Tr. at 2.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ neglected to consider the opinions of Plaintiff's treating physicians in accordance with 20 C.F.R. § 404.1527;

2)     the Appeals Council failed to assign any weight to medical opinions provided after the ALJ's decision;

3)      the ALJ neglected to consider Plaintiff's need to use a cane and his reaching and handling limitations in assessing his RFC;

4)      the ALJ improperly relied on Plaintiff's GAF scores to minimize the severity of his mental impairment; and

5)      the ALJ failed to discuss the decision from Plaintiff's prior hearing.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.      Legal Framework

1.      The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that

impairment meets or equals an impairment included in the Listings;[5] (4) whether such impairment prevents claimant from performing PRW;[6] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[5] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[6] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

42

supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Treating Physicians' Opinions

Plaintiff argues the ALJ erred in failing to accord appropriate weight to and evaluate his treating physicians' opinions based on the factors in 20 C.F.R. § 404.1527(c). [ECF No. 13 at 12]. The Commissioner maintains the ALJ properly attributed no special significance to the opinions of Plaintiff's treating physicians because all of Plaintiff's providers essentially indicated he was incapable of working, which is a decision reserved to the Commissioner. [ECF No. 15 at 13–14].

Medical opinions are "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." SSR 96-5p, *quoting* 20 C.F.R. §§ 404.1527(a)(2). "An opinion that a claimant is 'disabled' or 'unable to work' is

not a medical opinion but an administrative finding, and a physician's opinion on this ultimate issue is not entitled to special weight." *Dowdle v. Astrue*, C/A No. 2:10-2308-MBS, 2012 WL 887471, at *8 (D.S.C. March 15, 2012), citing 20 C.F.R. § 416.927(d); *see also* SSR 96-5p. Although treating physicians' opinions on issues reserved to the Commissioner are never entitled to controlling weight, they must still be evaluated. SSR 96-5p.

The opinion of a treating physician is entitled to deference. SSR 96-2p. If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. §§ 404.1527(c)(2). However, even if an ALJ determines a treating physician's opinion is not entitled to controlling weight, the treating physician's opinion may still support a finding that the claimant is disabled and the ALJ is required to consider the opinion, along with all other medical opinions in the record, based on the factors in 20 C.F.R. § 404.1527(c). *Id.* The factors include the following: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability based on the medical source's own observations; consistency with the record as a whole; specialization of the medical source; and other factors. 20 C.F.R. § 404.1527(c); *see also Johnson*, 434 F.3d at 654. In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must specify the weight accorded to the treating source's opinion, cite reasons for the weight accorded, and support his decision with evidence in the case record. SSR 96-2p.

44

The ALJ indicated the following with respect to the opinions rendered by Plaintiff's medical sources:

> The undersigned notes that several sources have completed medical source statements (MSS) that have opined that the claimant was unable to work (Exhibits 9F, 10F, 12F, 13F, 21F, and 22F). The undersigned notes that this opinion is a finding of fact reserved to the Commissioner (SSR 96-5p). Social Security Regulations and Social Security Ruling 96-2 provide that the undersigned must consider the opinions of physicians of record and that controlling weight must be given to the opinion of a treating physician if it is well supported by the objective medical evidence and if it is not inconsistent with other substantial evidence. The undersigned assigns minimal weight to their opinions for the reasons set forth below.

Tr. at 94–95. The ALJ then proceeded to discuss the individual opinions and provide reasons for his decision to discount each of them. Therefore, the undersigned considers each of these opinions in turn.

a.    Dr. McElhaney's Opinion

Dr. McElhaney completed a physician's statement form and indicated Plaintiff was unable to engage in any type of employment because of degenerative disc disease and depression. Tr. at 444. He indicated Plaintiff could not complete work-related tasks in a timely manner; meet the minimum standards of employment, such as productivity, punctuality, and reliability; exhibit the concentration, persistence, and pace required in a typical job setting; or work a normal workday without the necessity of frequent breaks and/or rest periods. Dr. McElhaney indicated Plaintiff was most likely to be absent more than four times per month if he attempted to work. *Id.* He stated "Plaintiff is restricted in standing over 30 min. due to condition of back or prolonged sitting." *Id.* He specified that

Plaintiff should not lift or carry over 10 pounds and stated his condition was permanent and total. *Id.*

The ALJ summarized Dr. McElhaney's opinion, but concluded that his treatment notes did not support the opinion. Tr. at 95. He also indicated Dr. McElhaney's observations differed from those of Dr. Cutshall, who treated Plaintiff after Dr. McElhaney retired. The ALJ wrote the following:

> In May 2011, Dr. McElhaney noted that the claimant had poor compliance and had not taken his medication at times. He had mild stiffness in the right knee, stiffness in the left knee, slight swelling in the left ankle, and tenderness in anterior aspect. He had limited lumbar flexion and tightness in the lower lumbar paraspinous. He was using a cane. On September 19, 2011, Dr. Cutshall, a new doctor in the same group, saw him and on exam, he had a normal range of motion and strength of the bilateral upper and lower extremities. He had normal alignment and mobility, no deformity, non-tenderness, normal straight leg raise, and normal deep tendon reflexes. He had 5/5 motor strength (Exhibit 11F).

*Id.*

The undersigned recommends the court find that the ALJ failed to properly review Dr. McElhaney's opinion. Although the Commissioner argues that Dr. McElhaney's opinion was an opinion that Plaintiff was disabled and was not entitled to any particular weight, a review of Dr. McElhaney's opinion reveals it to be more. Dr. McElhaney identified Plaintiff's diagnoses and limitations, which are two factors encompassed in the definition of a medical opinion. *See* 20 C.F.R. §§ 404.1527(a)(2); *see also* SSR 96-5p.

The undersigned also recommends the court find the ALJ provided insufficient reasons for his decision to accord little weight to Dr. McElhaney's opinion. By citing perceived inconsistencies between Dr. McElhaney's opinion and that of Dr. Cutshall, the

ALJ provided adequate reasons for declining to accord controlling weight to Dr. McElhaney's opinion. However, he did not give adequate deference to Dr. McElhaney's opinion, as required by SSR 96-2p, and he did not consider all of the factors set forth in 20 C.F.R. § 404.1527(c). A review of the record indicates Dr. McElhaney was both an examining and treating physician. *See* 20 C.F.R. § 404.1527(c)(1), (2). Dr. McElhaney treated Plaintiff on six occasions between June 28, 2010, and May 17, 2011. *See* Tr. at 318–20, 327–30, 339–40, 343–45, 360–63, 374; *see also* 20 C.F.R. § 404.1527(c)(2)(i). Dr. McElhaney performed a comprehensive evaluation of Plaintiff's body systems and noted his findings at most visits. *See id.*; *see also* 20 C.F.R. § 404.1527(c)(2)(ii). The limitations identified by Dr. McElhaney were substantiated to a significant extent by his treatment notes, which documented Plaintiff's complaints of pain and included objective evidence of elevated blood pressure; slow and antalgic gait with use of a cane; reduced grip strength in the right hand; restricted ROM of the neck, bilateral shoulders, and right lower extremity; decreased lumbar flexion, reflexes, and sensation; and tightness and tenderness to palpation. *See id.*; *see also* 20 C.F.R. § 404.1527(c)(3).

Although the ALJ identified inconsistencies with Dr. Cutshall's observations, Dr. McElhaney's treatment notes were consistent with other evidence in the record. *See* 20 C.F.R. s 404.1527(c)(4). EMG/NCS showed evidence of bilateral CTS. *See* Tr. at 424. The objective findings of Drs. Ringel, Shanbhag, and DiNicola revealed proximal weakness, gait instability, sensory loss, absent reflexes, reduced weightbearing in the right lower extremity, asymmetric posture, and reduced ROM. *See* Tr. at 393, 396, 400, 403–03, 410, 414, 417, 422, 425–37, 494–502, 504, 518. Dr. Ringel provided statements

that indicated Plaintiff was unable to work and Mr. Friddle and Dr. Smith indicated work-preclusive limitations, as well. *See* Tr. at 443, 469, 470, 552, 559. Dr. Cutshall completed a statement for Plaintiff to obtain a handicapped placard that suggested he was significantly limited in his ability to walk. *See* Tr. at 503.

Because the ALJ neglected to consider all but the consistency factor and because he failed to thoroughly examine that factor, the undersigned recommends a finding that his decision to accord little weight to Dr. McElhaney's opinion was not supported by substantial evidence.

            b.       Dr. Ringel's Opinion

In a physician's statement dated January 12, 2012, Dr. Ringel indicated Plaintiff was unable to engage in any type of employment and had a diagnosis of polymyositis. *Id.* He indicated Plaintiff was unable to complete work-related tasks in a timely manner; meet the minimum standards of employment, such as productivity, punctuality, and reliability; exhibit the concentration, persistence, and pace required in a typical job setting; and work a normal workday without the necessity of frequent breaks and/or rest periods. *Id.* Dr. Ringel found that Plaintiff would most likely be absent from work more than four times per month. *Id.* He wrote "No lifting. No climbing. Walking limited to 50.'"[7] *Id.* He then specified that Plaintiff should not lift or carry greater than 10 pounds. *Id.*

---

[7] Dr. Ringel's handwriting is somewhat difficult to decipher, but the undersigned considers this to be the correct interpretation of the statement.

The ALJ summarized Dr. Ringel's opinion, but found that his treatment notes did not support his conclusion for the following reasons:

> His treatment notes dated September 27, 2011, indicated that he had a history of mild polymyositis or myopathy on Prednisone, stable clinically. There was no progressive weakness. His gait and mobility were adequate. He injected a left carpal canal injection on October 3, 2011. On December 12, 2011, he was holding his own, strength-wise with a taper of Prednisone. Dr. Ringel noted on August 31, 2012, that regarding his myopathy, symptomatically, his muscle strength was normal (Exhibit 16F).

Tr. at 95.

The undersigned recommends the court find the ALJ did not adequately assess Dr. Ringel's opinion. Dr. Ringel provided specific limitations consistent with a medical opinion. *See* 20 C.F.R. §§ 404.1527(a)(2); *see also* SSR 96-5p. As with Dr. McElhaney's opinion, the ALJ provided sufficient reasons for his decision not to accord controlling weight to Dr. Ringel's opinion, but neglected to consider all of the factors in 20 C.F.R. § 404.1527(c). Dr. Ringel was both an examining and treating physician. *See* 20 C.F.R. § 404.1527(c)(1), (2). He began treating Plaintiff prior to June 2010 and examined Plaintiff at least 22 times between June 2010 and the date of the ALJ's decision. *See* Tr. at 424–37, 493–98, 501–02; *see also* 20 C.F.R. § 404.1527(c)(i). Dr. Ringel conducted thorough examinations and referred Plaintiff for objective tests that corroborated his findings. *See id.*; *see also* 20 C.F.R. § 404.1527(c)(2)(ii). The ALJ indicated that Dr. Ringel's treatment notes did not support the limitations he set forth, but a review of the record reveals that Dr. Ringel's observations varied from visit-to-visit. During some examinations, Plaintiff's condition was improved and during other visits, his symptoms were more pronounced. *See id.* The ALJ cited the evidence that he found contradictory to

Dr. Ringel's opinion, but he neglected the evidence that supported it. *See* 20 C.F.R. § 404.1527(c)(3). Dr. Ringel's opinion and observations were consistent with those of Dr. McElhaney, Dr. Shanbhag, and Dr. DiNicola and were supported by Dr. Cutshall's completion of the form that authorized Plaintiff to receive a disabled placard. *See* Tr. at 318–20, 327–30, 339–40, 343–45, 360–63, 374, 393, 396, 400, 402–03, 410, 414, 417, 422, 503, 504, 518; *see also* 20 C.F.R. § 404.1527(c)(4). The ALJ also neglected to consider Dr. Ringel's specialization as a neurologist. *See* 20 C.F.R. § 404.1527(c)(5). In light of the ALJ's failure to specify the weight afforded to Dr. Ringel's opinion and to consider multiple factors under 20 C.F.R. § 404.1527(c) and his inadequate consideration of the opinion's supportability, the undersigned recommends a finding that the ALJ did not properly consider the opinion.

### c.    Dr. Cutshall's Opinion

The ALJ indicated the medical evidence of record, which showed 5/5 motor strength and normal ROM of the bilateral extremities, did not support Dr. Cutshall's opinion that Plaintiff could not walk 100 feet nonstop without aggravating his medical condition. Tr. at 95.

Dr. Cutshall completed an application for Plaintiff to receive a disabled placard on December 20, 2012. Tr. at 503. He indicated Plaintiff was ordinarily unable to walk 100 feet nonstop without aggravating an existing medical condition and that his disability was permanent. *Id.*

The undersigned recommends a finding that the ALJ did not adequately consider Dr. Cutshall's opinion based on the factors in 20 C.F.R. § 404.1527(c). Although Dr.

Cutshall recorded no significant abnormalities on examination, the other treating physicians observed objective evidence of instability and abnormal gait that are consistent with Dr. Cutshall's statement. *See* Tr. at 320, 329, 341, 352, 362, 374, 392, 396, 400, 403, 410, 414, 417, 422, 427, 428, 435, 437, 502, 518. The ALJ neglected to consider the consistency of Dr. Cutshall's statement with the record as a whole. *See* 20 C.F.R. § 404.1527(c)(4). Therefore, the undersigned recommends a finding that he did not adequately assess Dr. Cutshall's opinion.

d.    Mr. Friddle's Opinion

On January 25, 2011, Mr. Friddle completed a physician's statement in which he indicated Plaintiff was unable to engage in any type of employment. Tr. at 443. He indicated Plaintiff was unable to complete work-related tasks in a timely manner; was unable to meet the minimum standards of employment, such as productivity, punctuality, and reliability; was unable to exhibit the concentration, persistence, and pace required in a typical job setting; was unable to work a normal workday without the necessity of frequent breaks and/or rest periods; and was likely to be absent from work more than four times per month. *Id.* He indicated Plaintiff had difficulty ambulating and was unable to effectively handle stress or any workload, both physically and emotionally. *Id.* He stated Plaintiff was unable to lift any weight. *Id.* He indicated Plaintiff's diagnosis to be severe major depressive disorder and stated the disability was permanent and total. *Id.*

On February 2, 2012, Dr. Smith and Mr. Friddle completed a medical source statement in which they indicated Plaintiff was unable to do the following: engage in any type of employment; complete work-related tasks in a timely manner; meet minimum

51

standards of employment (productivity, punctuality, and reliability); exhibit the concentration, persistence, and pace required in a typical job setting; and work a normal workday without the necessity of frequent breaks and/or rest periods. Tr. at 470. They estimated that Plaintiff would likely be absent from work on more than four days per month. *Id.* They specified the following: "Unable to cope w/ normal stressors. Unable to be punctual or reliable. Unable to perform any job tasks accurately or efficiently. Unable to communicate w/ public appropriately." *Id.*

The ALJ summarized Mr. Friddle's opinion, but concluded that it was inconsistent with Dr. Calhoun's evaluation and a GAF score of 70. Tr. at 95–96.

The undersigned recommends a finding that the ALJ did not adequately assess Mr. Friddle's opinion[8] based on the requirements in 20 C.F.R. § 404.1527(c). The ALJ neglected to consider the examining and treatment relationships, the supportability of Mr. Friddle's opinion based on his treatment notes, the consistency of his opinion with the observations of Plaintiff's other treating physicians, and Mr. Friddle's and Dr. Smith's

---

[8] Medical opinions may only be rendered by "acceptable medical sources," which include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-3p; *see* 20 C.F.R. § 404.1513(a). "Other sources" are defined as individuals other than acceptable medical sources and include medical providers, such as nurse practitioners, physician assistants, licensed clinical social workers, naturopaths, chiropractors, audiologists, and therapists, as well as non-medical sources, such as educational personnel, social welfare agency personnel, rehabilitation counselors, spouses, parents, other relatives, friends, neighbors, clergy, and employers. 20 C.F.R. § 404.1513(d). Medical opinions must be considered based on the criteria set forth in 20 C.F.R. § 404.1527(c), but opinions from "other sources" are not medical opinions. SSR 06-3p. As a physician's assistant, Mr. Friddle was not an acceptable medical source, but he was supervised by Dr. Smith, who endorsed the opinion dated February 2, 2012. Therefore, the ALJ should have considered that opinion based on the factors set forth in 20 C.F.R. § 404.1527(c).

specialties as mental health providers. The ALJ instead relied only on Dr. Calhoun's one-time assessment to refute Mr. Friddle's opinion, which provided a sufficient reason for declining to give the opinion controlling weight, but was inadequate to support his decision to reject the opinion outright.

### 2.    Appeals Council's Failure to Weigh Medical Opinions

Plaintiff argues the Appeals Council erred in failing to assign weight to the medical opinions submitted after the ALJ's decision and in failing to assess the opinions based on the factors set forth in 20 C.F.R. § 404.1527(c). [ECF No. 13 at 15]. The Commissioner argues Dr. Ringel's opinion provided no link to Plaintiff's condition prior to the ALJ's decision. *Id.* She contends that the Appeals Council properly denied review because there was no reasonable possibility that the opinions of Dr. Smith and Mr. Friddle would have changed the ALJ's decision and because their opinions were consistent with the RFC assessed by the ALJ. *Id.* at 16.

The Social Security Administration's (SSA) regulations "specifically permit claimants to submit additional evidence, not before the ALJ, when requesting review by the Appeals Council." *Meyer v. Astrue*, 662 F.3d 700, 705 (4th Cir. 2011). "If new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 416.970(b). "Evidence is new 'if it is not duplicative or cumulative' and is material if there is 'a reasonable possibility that the new evidence would have changed the outcome.'" *Meyer*, 662 F.3d at 705, *citing Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991). If the new and material

evidence relates to the period on or before the date of the ALJ's hearing decision, the Appeals Council should evaluate it as part of the entire record. 20 C.F.R. § 416.970(b). "[I]f the Appeals Council finds that the ALJ's 'action, findings, or conclusion is contrary to the weight of the evidence currently of record,'" it shall grant the request for review and either issue a new decision or remand the case to the ALJ for reconsideration of the evidence. *Meyer*, 662 F.3d at 705, *citing* 20 C.F.R. §§ 404.967, 404.977(a), and 404.979. However, if after reviewing the entire record, including the new and material evidence, the Appeals Council "finds the ALJ's action, findings, or conclusions not contrary to the weight of the evidence, the Appeals Council can simply deny the request for review" without explaining its rationale. *Id.*

The Fourth Circuit's decision in *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 340–41 (4th Cir. 2012), suggests that evidence created after the ALJ's decision may be considered as new and material evidence and given retrospective consideration under certain circumstances. In *Bird*, the court explained that its decisions in *Moore v. Finch*, 418 F.2d 1224 (4th Cir. 1969) and *Johnson v. Barnhart*, 434 F.3d 650 (4th Cir. 2005) provided that "retrospective consideration of evidence" was "appropriate when 'the record is not so persuasive as to rule out any linkage' of the final condition of the claimant with his earlier symptoms." 699 F.3d at 341, citing *Moore*, 418 F.3d at 1226.

The undersigned recommends the court find that the Appeals Council did not err in failing to assign any particular weight to the opinions submitted after the ALJ's decision, but that the records the Appeals Council rejected and the opinion it admitted should be considered on remand. The Fourth Circuit unequivocally found in *Meyer* that

54

the Appeals Council was not required to make specific findings regarding new evidence when it determined the new evidence did not render the ALJ's decision contrary to the weight of the evidence. *See* 662 F.3d at 705. Because linkage of Plaintiff's condition between his DLI and the time that the opinions were rendered cannot be ruled out and because the undersigned has recommended remand for the ALJ to reconsider the earlier opinions of Dr. Ringel and Dr. Smith and Mr. Friddle, the ALJ should consider the additional evidence.

### 3.    Use of Cane, Reaching, and Handling

Plaintiff argues the ALJ failed to consider his use of a cane and restrictions on his abilities to reach and handle in assessing the RFC. [ECF No. 13 at 15–16]. Plaintiff maintains that his need for an assistive device and his limitations on reaching and handling erode the occupational base for sedentary work and preclude him from engaging in gainful employment. *Id.* at 17.

The Commissioner argues the ALJ reasonably assessed Plaintiff's RFC in light of the available evidence. [ECF No. 15 at 16]. She maintains that, even if the ALJ should have assessed limitations on Plaintiff's abilities to reach and handle, Plaintiff was not compromised because the VE identified a job of surveillance systems monitor that did not require reaching or handling. *Id.* at 17. She further contends that Plaintiff's need to use a cane was accommodated by the fact that the ALJ limited him to sedentary work. *Id.*

In assessing a claimant's RFC, the ALJ must identify the limitations imposed by the claimant's impairments and assess his work-related abilities on a function-by-function basis. SSR 96-8p. "The RFC assessment must include a narrative discussion describing

how all the relevant evidence in the case record supports each conclusion and must cite specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." *Id.* Relevant evidence includes medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms that are reasonably attributed to the medically-determinable impairment, evidence from attempts to work, need for structured living environment, and work evaluations. *Id.* The Fourth Circuit recently held that "remand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015), citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013).

The ALJ limited Plaintiff to sedentary work with no climbing of ladders, ropes, and scaffolds and occasionally performing all other postural activities. Tr. at 91. He did not include any limitations with regard to Plaintiff's use of his upper extremities. *See* Tr. at 91. The ALJ indicated that he limited Plaintiff to sedentary work in the RFC assessment "and therefore no extensive walking is required." Tr. at 93. He noted treatment visits in which Plaintiff presented with and without a cane. Tr. at 92–94. He indicated that no findings suggested "an impairment of grip or other complications that would be inconsistent with the above RFC." Tr. at 93.

The undersigned recommends a finding that, in assessing Plaintiff's RFC, the ALJ neglected to consider evidence in the record that suggested Plaintiff required the use of a

cane. Although a few treatment notes specifically documented that Plaintiff presented to medical appointments without a cane, the record contains significant evidence of Plaintiff's unstable gait and ambulation with a cane. *See* Tr. at 320, 329, 341, 352, 362, 363, 374, 393, 396, 400, 403, 410, 414, 417, 422, 428, 435, 466, 502, 518. Furthermore, Plaintiff was prescribed a cane by Dr. McElhaney in February 2011. Tr. at 369. Although the Commissioner argues the ALJ accounted for Plaintiff's use of a cane by limiting him to sedentary work, SSR 96-9p describes sedentary work as follows:

> The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.

Although Plaintiff's need for a cane would not affect his ability to meet the sitting requirements of a sedentary job, it may affect his abilities to meet the occasional standing and walking requirements and to lift and carry articles. Because the ALJ neglected to factor Plaintiff's use of a cane into his RFC assessment, the undersigned recommends a finding that he did not adequately assess Plaintiff's RFC.

The undersigned also recommends a finding that the ALJ erred in failing to consider evidence that Plaintiff's ability to handle was limited. The ALJ erroneously concluded that the record did not indicate an "impairment of grip." Plaintiff's physicians noted reduced grip strength in his right hand and Plaintiff was diagnosed with bilateral CTS. *See* Tr. at 329 (4/5 grip on right), 341 (4/5 grip on right), 352 (decreased grip in

right hand), 360 (CTS affecting grip and use of right hand), 362 (decreased grip strength in right hand), 374 (decreased grip strength in right hand). The ALJ's failure cannot be cured by the Commissioner's post hoc argument that one of the jobs the ALJ found Plaintiff to be able to perform did not require handling. *See Hall v. Colvin*, C/A No. 8:13-2509-BHH-JDA, 2015 WL 366930 (D.S.C. Jan. 15, 2015); *Cassidy v. Colvin*, C/A No. 1:13-821-JFA-SVH, 2014 WL 1094379, at *7n. 4 (D.S.C. March 18, 2014), citing *Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003) ("[G]eneral principles of administrative law preclude the Commissioner's lawyers from advancing grounds in support of the agency's decision that were not given by the ALJ.").

Although Plaintiff argues that the ALJ failed to incorporate into the RFC a reaching restriction, the undersigned's review of the record yields no definitive evidence to indicate Plaintiff's ability to reach was limited. Plaintiff complained of pain in his shoulders and had mildly limited ROM, but an x-ray was negative for arthritis of the shoulder joints and he denied paresthesias and weakness. *See* Tr. at 12, 327, 331, 341. Upon remand, the ALJ should determine whether and to what extent Plaintiff's ability to reach was compromised as a result of shoulder pain and mildly limited ROM.

### 4.    ALJ's Reliance on GAF Scores

Plaintiff argues the ALJ relied on one GAF score issued by the consultative examiner to undermine the records and the opinions of his mental health providers regarding the severity of his emotional impairment. [ECF No. 13 at 18]. The Commissioner maintains that the ALJ did not rely solely on the GAF score Dr. Calhoun assessed, but also relied on the information Plaintiff provided to Dr. Calhoun and Dr.

Calhoun's observations that were consistent with the GAF score assigned. [ECF No. 15 at 18].

A GAF score may reflect the severity of a claimant's functioning or his impairment in functioning at the time the GAF score is assessed, but it is not meaningful without additional context. *See Parker v. Astrue*, 664 F. Supp. 2d 544, 557 (D.S.C. 2009) (stating that "Plaintiff's GAF score is only a snapshot in time, and not indicative of Plaintiff's long term level of functioning.").

In *Parker*, the court cited to the DSM-IV's description of several ranges of GAF scores, as follows:

> A GAF score of 51–61 indicates moderate symptoms (e.g., circumstantial speech and occasional panic attacks) or moderate difficulty in social or occupational functioning (e.g., no friends, unable to keep a job). A GAF score of 61-70 is less severe and indicates only that a person has "some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally function[s] pretty well, [and] has some meaningful interpersonal relationships." Diagnostic & Statistical Manual of Mental Disorders-Text Revision (DSM-IV-TR) (2000).

664 F. Supp. 2d at 549 n.3.

In addition to the GAF score's other shortcomings, the Commissioner has explained that the GAF scale "does not have a direct correlation to the severity requirements in [the Commissioner's] mental disorders listings." *Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury*, 65 Fed. Reg. 50746-01, 50764–65 (Aug. 21, 2000).

The ALJ indicated "[a] GAF score of 70 (7F), which is indicative of mild symptoms, is inconsistent with a finding of disability due to mental health." Tr. at 96.

Had the ALJ relied solely on the GAF score assessed by Dr. Calhoun to determine Plaintiff's mental RFC, his finding would not be supported by substantial evidence. *See Parker*, 664 F. Supp. 2d at 557. However, because the ALJ discussed Dr. Calhoun's specific observations and Plaintiff's self-reported activities, he did not rely solely on the GAF score to discount Mr. Friddle's opinion. Nevertheless, the ALJ neglected to acknowledge evidence in the record regarding Plaintiff's long term mental functioning that included six visits with Mr. Friddle and indications from Dr. McElhaney and Dr. Cutshall that Plaintiff struggled with depression. *See* Tr. at 312–15, 347, 466, 550–51. Therefore, the undersigned recommends a finding that the ALJ erred to the extent that he relied upon the GAF score assessed by Dr. Calhoun to discount evidence in the record regarding Plaintiff's long term psychological functioning.

### 5.    Failure to Discuss Prior ALJ Decision

Plaintiff cites the Fourth Circuit's finding in *Albright v. Comm'r of Soc. Security Admin*, 174 F.3d 473 (4th Cir. 1999), to argue that the ALJ was required to discuss the prior ALJ's findings in his decision. [ECF No. 13 at 19]. The Commissioner concedes that the ALJ failed to discuss and assign weight to the prior ALJ's decision at each relevant step of the sequential disability evaluation, but argues that the ALJ's error was harmless because the ALJ found the same impairments and limitations and reached the same conclusion. [ECF No. 15 at 19].

The Fourth Circuit issued *Albright* in response to an SSA ruling that prevented claimants from obtaining benefits on second and subsequent applications unless they could "produce new and material evidence" that their impairments increased in severity from the date of the prior finding. *Albright*, 174 F.3d at 475. In striking down the ruling, the court explained that the ruling "operates to mechanistically merge two claims into one" and "carves out an exception to the general rule that separate claims are to be considered separately." *Id.* at 476. The SSA subsequently explained in Acquiescence Ruling ("AR") 00-1(4) that it interpreted *Albright* "to hold that where a final decision of SSA after a hearing on a prior disability claim contains a finding required at a step in the sequential evaluation process for determining disability, SSA must consider such finding as evidence and give it appropriate weight in light of all relevant facts and circumstances when adjudicating a subsequent claim involving an unadjudicated period."

On May 25, 2011, ALJ Ivar E. Avots issued an unfavorable decision in Plaintiff's prior claim. Tr. at 154–74. ALJ Avots found that Plaintiff's severe impairments included lumbar degenerative disc disease and obesity. Tr. at 159. He assessed Plaintiff to have the RFC to perform sedentary work (lift, carry, push, or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk two hours in an eight-hour workday; and sit six hours in an eight-hour workday), but determined that he should not climb ladders/ropes/scaffolds, should only occasionally perform other postural activities, and should avoid concentrated exposure to hazards, fumes, odors, dusts, gases, and poor ventilation. Tr. at 161. ALJ Avots found that Plaintiff could perform jobs that existed in significant numbers in the national economy. Tr. at 172. He determined Plaintiff had not

been under a disability from January 21, 2007, through the date of the decision. Tr. at 174.

The ALJ similarly found that Plaintiff's severe impairments included obesity and degenerative disc disease. Tr. at 89. He found Plaintiff to have the same physical limitations as those assessed by ALJ Avots. Tr. at 91. He determined Plaintiff could perform jobs that existed in significant numbers in the national economy. Tr. at 97. Finally, he found that Plaintiff was not under a disability at any time from May 26, 2011, through June 30, 2012. Tr. at 98.

The undersigned recommends the court find that any error on the part of the ALJ in failing to discuss and specify the weight accorded to the prior ALJ's decision was harmless. Although the ALJ did not specify ALJ Avots' findings or indicate the specific weight he accorded them, a comparison of their decisions shows that the ALJ accorded significant weight to ALJ Avots' findings by adopting many of the same findings. The ALJ found Plaintiff had the same severe impairments as did ALJ Avots, but that Plaintiff had several additional impairments, as well. *Compare* Tr. at 89, *with* Tr. at 159. The ALJ also assessed the same physical restrictions as those imposed by ALJ Avots, but found that Plaintiff had additional mental limitations based on the record before him. *Compare* Tr. at 161, *with* Tr. at 91. Like ALJ Avots, the ALJ found that Plaintiff could perform work that existed in the national economy and was not under a disability during the relevant period. *Compare* Tr. at 172 and 174, *with* Tr. at 97 and 98.

Had the ALJ found Plaintiff to not have the same severe impairments or physical limitations as those indicated by ALJ Avots, Plaintiff might have been compromised and

62

the ALJ's failure to explain the deviation from ALJ Avots' decision could not be considered harmless. However, because the ALJ found the same severe impairments and physical restrictions as those indicated by ALJ Avots, Plaintiff was not harmed by the ALJ's failure to discuss and specify the weight accorded to ALJ Avots' decision. Therefore, the ALJ would have reached the same result if he had analyzed ALJ Avots' decision and his error was harmless. *See Mickles v. Shalala* (affirming denial of benefits where the ALJ erred in evaluating a claimant's pain because "he would have reached the same result notwithstanding his initial error").

Although the undersigned recommends a finding that the ALJ's error in failing to assess and explain the weight accorded to the prior ALJ's decision was harmless based on his specific findings in this case, it would be prudent for the ALJ to address the prior ALJ's decision on remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

June 1, 2015                           Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).